1  Shana Lazerow, State Bar No. 195491
   Philip Huang, State Bar No. 230115
2  COMMUNITIES FOR A BETTER ENVIRONMENT
   1440 Broadway, Suite 701
3  Oakland, California 94612
   Tel: (510) 302-0430
4  Fax: (510) 302-0438

5  Attorneys for Plaintiff
   COMMUNITIES FOR A BETTER ENVIRONMENT

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITIES FOR A BETTER ENVIRONMENT a California non-profit corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>ACTION METAL RECYCLING, INC., a corporation,<br><br>Defendant | Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.) |

COMMUNITIES FOR A BETTER ENVIRONMENT ("CBE"), by and through its counsel, hereby alleges:

## I. JURISDICTION AND VENUE

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

2. On November 10, 2006, CBE provided notice of the Defendant's Clean Water Act violations, and of its intention to file suit, to the U.S. Attorney General; Administrator of the United States Environmental Protection Agency ("EPA"); Administrator of EPA Region IX; Executive Director of the State Water Resources Control Board ("State Board"); Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board"); and to Defendant Action Metal Recycling, Inc. ("Action Metal"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A) (attached hereto as Exhibit A).

3. More than sixty days have passed since notice was served on Defendant and state and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint.  This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II. INTRODUCTION

5. This complaint seeks relief for Defendant's discharges of polluted storm water from a scrap metal, glass, and plastic recycling facility into the waters of the United States in violation of the Act and the State of California's general permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by

COMPLAINT

1

Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, (hereinafter "General Permit" or "Permit").  Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act, are ongoing and continuous.

6. The failure on the part of industrial facilities such as Action Metal to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of the San Francisco Bay and other area receiving waters.  With every rainfall event, a tremendous amount of polluted rainwater originating from area industries pours into local creeks, streams, and ultimately into the Bay.  In most areas of Contra Costa County, storm water drains completely untreated through the storm drain system directly to San Pablo or San Francisco Bay, or one of their tributary waterways.

7. Stormwater pollution is a matter of serious public concern.  Research by the San Francisco Estuary Institute shows that stormwater runoff is the primary source of several impairing pollutants, including copper and nickel.

### III.  PARTIES

8. Plaintiff Communities for a Better Environment is a non-profit, public benefit corporation organized under the laws of the State of California with offices in Oakland and Huntington Park, California.  CBE has approximately 20,000 members throughout the State of California, many of whom live and recreate in and around the San Francisco Bay, San Pablo Bay, and their watershed.  CBE works to protect and enhance the environment and public health primarily in California's urban areas.  For nearly 30 years, CBE has actively advocated and litigated water quality issues in California.

9. CBE's members are among the people who use and enjoy California's waters – they live, work and recreate near California's waterways.  Many of CBE's members rely on fish from San Francisco Bay and its tributaries as a critical part of their diet, and suffer when industrial pollutants contaminate this food source.  Other members would like to eat fish from the Bay, but cannot because of Bay pollution.  Defendant's discharge of storm water and non-storm water

COMPLAINT

2

containing pollutants impairs CBE members' use of the Bay.  Thus, the interests of CBE's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the General Permit.  The relief sought herein will redress the harms to CBE caused by Defendant's activities.

10.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

11.     Plaintiff is informed and believes, and thereupon alleges, that Defendant Action Metal is a business organized under the laws of the State of California and having its principal place of business in California.

## IV.  STATUTORY BACKGROUND

12.     Section 301(a) of the Act, 33 U.S.C. §1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. §1342.

13.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. §1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342.  Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the U.S. EPA Administrator has authorized California's State Water Resources Control Board to issue NPDES permits, including general NPDES permits, in California.

14.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Industrial Storm Water Permit (the General Permit) on or about November 19, 1991, modified the General Permit on or around September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of

1  the Clean Water Act, 33 U.S.C. § 1342(p).

2    15. In order to discharge storm water lawfully in California, industrial dischargers must
3  comply with the terms of the General Permit, or have obtained and complied with an individual
4  NPDES permit.

5    16. The General Permit contains certain absolute prohibitions.  Discharge Prohibition
6  A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm
7  water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to
8  the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm
9  water discharges and authorized non-storm water discharges that cause or threaten to cause
10 pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit
11 prohibits storm water discharges to any surface or ground water that adversely impact human
12 health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm
13 water discharges that cause or contribute to an exceedance of any applicable water quality
14 standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's
15 Basin Plan.

16   17. In addition to absolute prohibitions, the General Permit contains a variety of
17 substantive and procedural requirements that dischargers must meet.  Facilities discharging, or
18 having the potential to discharge, storm water associated with industrial activity that have not
19 obtained an individual NPDES permit must apply for coverage under the State's General Permit by
20 filing a Notice of Intent ("NOI").

21   18. Dischargers must also develop and implement a Storm Water Pollution Prevention
22 Plan ("SWPPP").  The SWPPP must comply with the standards of Best Available Technology
23 Economically Achievable ("BAT") and Best Conventional Pollutant Control Technology ("BCT").
24 The General Permit requires that this SWPPP be developed and implemented before October 1,
25 1992, or by the time industrial activities begin.  The SWPPP must include, among other elements:
26 (1) a narrative description and summary of all industrial activity, potential sources of pollutants
27 and potential pollutants; (2) a site map showing the storm water conveyance system, associated
28 points of discharge, direction of flow, areas of industrial activities, and areas of actual and

COMPLAINT

4

potential pollutant contact; (3) a description of storm water management practices, best management practices ("BMPs") and preventive maintenance undertaken to avoid storm water contamination; (4) the location where significant materials are being shipped, stored, received and handled, as well as the typical quantities of such materials and the frequency with which they are handled; (5) a description of dust and particulate generating activities; and (6) a summary of storm water sampling points. The SWPPP must be assessed annually and revised as necessary to ensure its effectiveness.

19. The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

20. The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992. Facilities commencing industrial activities after that date must implement their monitoring programs upon commencement of activities.

21. The General Permit also requires that dischargers submit "Annual Reports" to the Regional Board every year. As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report. Dischargers must also collect and analyze storm water samples from at least two storms per year. Section B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance, and total organic content ("TOC") or oil and grease, certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility. Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution. The

monitoring and reporting program requires dischargers to certify, based upon the annual site inspections, that the facility is in compliance with the General Permit and report any non-compliance, and contains additional requirements as well.

22. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of $27,500 per day for violations occurring between July 14, 2001 and March 15, 2004, and $32,500 per day per violation for all violations occurring since March 15, 2004. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. §§ 19.1 - 19.4 (pp. 200-202).

## V. STATEMENT OF FACTS

23. Defendant operates a facility at 385 Pittsburg Avenue in Richmond, California, which is engaged in recycling scrap metal, glass, and plastic (the "Facility"). The Facility consists of several buildings, a loading area, outdoor equipment, and a paved yard.

24. Investigators for Plaintiff have conducted observations of the Facility.

25. The industrial activities at the site include the crushing, stockpiling, processing, and transporting of scrap metal, glass, and plastic; storage, operation, maintenance and repair of machinery; and the handling, processing, and storage of various materials used in the recycling process including scrap metal and used machinery parts.

26. Operations at the Facility occur outdoors and are exposed to rainfall. These activities include, but are not limited to the following: scrap operations such as shredding, processing, and segregation of scrap metal, auto husks and ferrous and non-ferrous metals; storage of auto husks, household machinery, industrial machinery and other items in preparation for processing; storage of scrap metal; glass recycling activities such as receiving and sorting glass for recycling; storage of recycled glass; and operation of trucks and equipment associated with stockpiling, shredding, processing, segregating, receiving and shipping materials for processing and after processing.

27.   The Facility property is exposed to storm water and storm flows.  This property is covered by piles of scrap metal from automobiles, household appliances, transformers, electric motors, electric components, radiators, batteries, ferrous and non-ferrous turnings and cuttings, wire, tanks, containers, drums and miscellaneous industrial machinery existing in different stages of corrosion and decay.  These materials may release, among other substances, fuel, oil, lubricants, PCBs, lead, lead acid, lead oxides, iron, aluminum, copper, zinc, cadmium, mercury, asbestos, benzene, ethylene glycol, radioactive isotopes, grease, paint, suspended solids, dust and debris, pH-affecting substances and chemical residue.

28.   Industrial machinery and heavy equipment, including trucks, are operated and stored at the Facility in areas exposed to storm water flows.  Plaintiff is informed and believes, and thereupon alleges, that such machinery and equipment leak contaminants such as oil, grease, diesel fuel, anti-freeze and hydraulic fluids which are exposed to storm water flows.

29.   The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks essential structural and management practices to prevent rainfall, storm water, and non-storm water flows from coming into contact with sources of contaminants at the Facility.  Investigations have documented the presence of uncontrolled process water at the Facility.  Additionally, CBE believes insufficient measures are in place to remove pollutants prior to the discharge of storm water and non-storm water from the Facility.  As a result of Action Metal's failure to implement adequate structural and non-structural management practices and controls at the Facility, Action Metal discharges contaminated and unpermitted storm water and non-storm water from the Facility into waters of the United States.  Additional activities at the Facility that are alleged to constitute violations are discussed below.

30.   Vehicle traffic at the Facility tracks dust and particulate matter, standing polluted water, and mud out onto the surrounding sidewalks and streets.  Wind and storm water contact then wash this pollution into the receiving waters.

31.   During rain events, storm water laden with contaminants, possibly mixed with process water or wastewater, flows off the Facility and into the storm drain system.

COMPLAINT

32. At the Facility, Defendant stores products and materials likely to lead to the contamination of storm water outdoors in areas lacking any storm water controls or containment. As a result, storm water flows over and across these materials and becomes contaminated prior to leaving the Facility.

33. Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged during every rain event from the Facility directly to storm drains that flow into San Pablo Creek and San Pablo Bay, and ultimately into the San Francisco Bay.

34. San Francisco Bay and its tributaries, including San Pablo Creek and San Pablo Bay, are waters of the United States.

35. Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit due to the continued discharge of contaminated storm water from the Facility.

36. Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to develop and implement an adequate Storm Water Pollution Prevention Plan.

37. Information available to Plaintiff indicates the continued existence of unlawful storm water and non-storm water discharges at the Facility.

38. Plaintiff is informed and believes, and thereupon alleges, that Defendant has not developed and implemented adequate monitoring, reporting and sampling programs for the Facility. Plaintiff is informed and believes, and thereupon alleges, that Defendant has not provided adequate information as to sampling points, sampled with adequate frequency, conducted adequate visual monitoring, or submitted Annual Reports to the Regional Board as required.

VI. **CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**Discharges of Contaminated Storm Water**

**in Violation of Permit Conditions and the Act**

**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

39. Plaintiff realleges and incorporates Paragraphs 1-39, as if fully set forth herein.

COMPLAINT

8

40. Discharge Prohibition A(2) of the General Permit provides that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitations C(1) and C(2) of the General Permit provide that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

41. Plaintiff is informed and believes, and thereupon alleges, that since at least November 20, 1997, Defendant has been discharging polluted storm water from the Facility to storm drains that flow either directly or via tributaries into San Pablo and/or San Francisco Bay, in violation of the General Permit.

42. During every rain event, rainwater flowing over exposed products, waste materials and accumulated pollutants at the Facility becomes contaminated with pollutants and flows untreated from the facility into the storm drain system. This contaminated storm water flows through the storm drain system either directly or via tributaries into San Pablo and/or San Francisco Bay.

43. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

44. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

45. Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

46. Every day since October 1, 1992 that Defendant has discharged or continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Those violations constitute at

least 212 violations of the Act, based on rain data obtained from the Western Regional Climate Center and the California Department of Water Resources for the five-year period preceding the date of Plaintiff's Notice of Violation and Intent to Sue.  When additional rain data evidencing discharges of contaminated storm water from the Facility becomes available, CBE will include those violations in this action.  These violations are ongoing and continuous.

47. WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Non-Storm Water Discharges in Violation of Permit Conditions and the Act

### (Violations of 33 U.S.C. §§ 1311, 1342)

48. Plaintiff re-alleges and incorporates Paragraphs 1-48, as if fully set forth herein.

49. Discharge Prohibition A(1) and Special Condition D(1) of the General Permit prohibit discharges of material other than storm water (i.e., non-storm water discharges) to a storm sewer system or waters of the United States, except under certain specified circumstances. Unauthorized non-storm water discharges must be either separately permitted or eliminated.

50. Plaintiff is informed and believes, and thereupon alleges, that since at least November 20, 1997, Defendant has been discharging unauthorized non-storm water that includes but is not limited to water used in industrial processes at the Facility as well as water used to rinse or wash the Facility or industrial materials at the Facility, which flows into storm drains and either directly or via tributaries into San Pablo and/or San Francisco Bay in violation of the General Permit.

51. Every day that Defendant fails to address these non-storm water discharges from the Facility in violation of the General Permit is a separate day of violation of the Act.  Defendant is subject to penalties for each day over the five years preceding Plaintiff' notice of intent to sue, which constitute more than 1,800 days of violation and are continuing.

52. WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION

### Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan

### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

53. Plaintiff re-alleges and incorporates Paragraphs 1-53, as if fully set forth herein.

54.     Section A of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") no later than October 1, 1992 or upon commencement of industrial activities.

55.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. CBE's investigation of the conditions at the Facility demonstrates that Action Metal operates with an inadequately developed or implemented SWPPP, in violation of the requirements set forth above. Specifically, Action Metal has not implemented a SWPPP requiring BMPs that adequately minimize the exposure of storm water to pollutants associated with industrial activities, that control and minimize contaminated runoff and non-storm water discharges, or that adequately filter and remove pollutants in storm water and non-storm water prior to discharge so as to prevent or reduce pollutants, as required by Section A(8). Action Metal has not developed or implemented a SWPPP that prevents discharges from violating Discharge Prohibition A, Effluent Limitation B, and Receiving Water Limitation C. Action Metal has not adequately evaluated and revised its SWPPP to address these failures as required by Sections A(7) and (8). Action Metal has not developed or implemented a SWPPP requiring BMPs that achieve BAT and BCT, in violation of Effluent Limitation B(3).

56.     Each day that Defendant has failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

57.     Defendant has been in violation of the SWPPP requirement every day since November 20, 1997. Defendant continues to be in violation of the SWPPP requirement each day that it fails to develop and fully implement an adequate SWPPP for the Facility. Every day since November 10, 2001 that Defendant fails to comply with the SWPPP requirement is a violation of the General Permit and a separate day of violation of the Act. Defendant is subject to penalties for each day over the five years preceding Plaintiff's notice of intent to sue, which constitute more than 1,800 days of violation and are continuing.

58.     WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## FOURTH CAUSE OF ACTION

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program**

**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

59. Plaintiff re-alleges and incorporates Paragraphs 1-59, as if fully set forth herein.

60. Section B(1) and Provision E(3) of the Order require facility operators to develop and implement an adequate monitoring program to satisfy several objectives. The monitoring program must ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Order (Section B(2)). The monitoring program must also ensure that pollution prevention practices and the SWPPP are evaluated and revised to meet changing conditions at the facility, as required by Section A of the Order (Section B(2)). Finally, the monitoring program must measure the effectiveness of the BMPs in preventing or reducing pollutants in storm water and authorized non-storm water discharges, and must be revised whenever appropriate (Section B(2)). Facility operators must explain how the monitoring program will satisfy these objectives (Section B(10)). The monitoring program must be in place no later than October 1, 1992, or upon the commencement of industrial activities. (Section B(1)).

61. An adequate monitoring program requires facility operators to visually observe all drainage locations at the facility for storm water discharges, authorized non-storm water, and unauthorized non-storm water (Section B(3), (4)). Specifically, Section B(3) of the Order requires facility operators to conduct quarterly visual observations of all drainage areas within their facilities for the presence of authorized and unauthorized non-storm water discharges. Section B(4) requires facility operators to visually observe storm water discharges from one storm event per month during the wet season (October 1-May 30). These observations must document the presence of any floating or suspended material, oil and grease, discolorations, turbidity, odor, and source of any pollutants (Section B(3), (4)). Facility operators must maintain records of observation dates, locations observed, observations, and responses taken to eliminate unauthorized non-storm water discharges and reduce or prevent pollutants from contacting non-storm water and storm water discharges (Section B(3), (4)).

62. Facility operators must also observe and collect samples of storm water discharges

from all locations where storm water is discharged (Section B(5), (7)).  Sample collection from all discharge points must occur during the first storm event of the wet season and at least one other storm event of the wet season (sampling of stored or contained storm water must occur any time the stored or contained storm water is released) (Section B(5)).  Storm water samples must be analyzed for total suspended solids ("TSS"), pH, specific conductance, and total organic carbon ("TOC") or oil and grease, toxic chemicals and other pollutants that are likely to be present in the storm water discharges, and any other analytical parameters listed in the Order under Table D or required by the Regional Water Board (Section B(5)(c)).

63.     Facility operators must comply with certain procedural requirements to achieve the objectives of the monitoring program.  Among these requirements, operators must explain monitoring methods and describe the location, frequency, and detection limits used in the monitoring program (Section B(10)).  Facility operators also must retain records of all storm water monitoring information and copies of all reports for at least five years (Section B(13)).  By July 1 of each year, facility operators must also submit an Annual Report to the Regional Water Board.  The Annual Report must include a summary and evaluation of all monitoring results, all records of the monitoring program, any applicable analysis and laboratory reports, the Annual Comprehensive Site Compliance Evaluation Report, and an explanation of any failure to implement an activity required by the Order (Section B(13), (14)).

64.     Information available to CBE indicates that Action Metal has been operating with an inadequately developed and implemented monitoring program in violation of the substantive and procedural monitoring requirements set forth above.  Specifically, Action Metal has failed to observe or record visual observations of non-storm water and storm water discharges as required by Sections B(3) and (4) of the Order.  Action Metal has also failed to collect storm water samples as required by Sections B(5) and B(7) of the Order.  Action Metal has also failed to comply with the procedural requirements of the monitoring program by failing to explain the monitoring methods, including the rationale and description of the location, frequency and detection limits, in violation of Section B(10) of the Order.  Action Metal has also violated Section B(14) of the Order by failing to submit all Annual Reports as required to the Regional Board.  Action Metal's Annual

Reports are incomplete and lack the necessary descriptions and evaluations of visual observations, sampling and analysis results, laboratory reports, and explanations of all failures to implement required activities.

65.     As a result of Action Metal's apparent failure to adequately develop and implement a monitoring program, Action Metal has been in continuous violation of the Order and the Act every day since November 20, 1997.  Action Metal will continue to be in violation of the monitoring and reporting requirements every day it fails to develop and implement an adequate and effective monitoring and reporting program at the Facility.  Action Metal is subject to penalties for all violations of the Order and the Act occurring since November 10, 2001.

66.     WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## VII.     RELIEF REQUESTED

67.     Wherefore, Plaintiff respectfully request that this Court grant the following relief:

(a) Declare Defendant to have violated and to be in violation of the Act as alleged herein;

(b) Enjoin Defendant from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility;

(c) Enjoin Defendant from further violating the substantive and procedural requirements of the General Permit;

(d) Order Defendant to pay civil penalties of $27,500 per day per violation for all violations occurring between November 10, 2001 and March 15, 2004, and $32,500 per day per violation for all violations occurring since March 15, 2004;

(e) Order Defendant to take appropriate actions to restore the quality of navigable waters impaired by their activities;

(f) Award Plaintiff's costs (including reasonable attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

(g) Award any such other and further relief as this Court may deem appropriate.

Dated: May 25, 2007                    Respectfully submitted,

COMPLAINT

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                        By: _____
                              Philip Huang
                              Attorney for Plaintiff
                              COMMUNITIES
                              FOR A BETTER ENVIRONMENT

Case 3:07-cv-02768-JCS     Document 1     Filed 05/25/2007     Page 17 of 17