1   C. D. Michel, S.B.N. 144258
    cmichel@tmllp.com
2   W. Lee Smith, S.B.N. 196115
    lsmith@tmllp.com
3   **TRUTANICH • MICHEL, LLP**
    180 E. Ocean Blvd., Suite 200
4   Long Beach, CA 90802
    Telephone: (562) 216-4444
5   Facsimile: (562) 216-4445

6   Attorneys for Defendant
    Action Metal Recycling, Inc.

7

8           **UNITED STATES DISTRICT COURT**

9       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| Communities for a Better Environment, a California non-profit corporation, | CASE NO: C07-02768 JCS |
| Plaintiff, | **LODGING OF EXECUTED CONSENT AGREEMENT FOR COURT APPROVAL AND JOINT REQUEST TO TAKE MAY 9, 2008, CASE MANAGEMENT CONFERENCE OFF CALENDAR** |
| v. | |
| Action Metal Recycling, Inc., a California corporation, | Magistrate Judge: Joseph C. Spero |
| Defendant. | Date: May 9, 2008<br>Time: 1:30 p.m. |

19       Plaintiff Communities for a Better Environment and Defendant Action Metal

20   Recycling, Inc. (collectively the "Parties") have executed a Consent Agreement

21   ("Agreement") to facilitate settlement of the instant action. A true and correct copy

22   of the Agreement is being lodged herewith. The Agreement is also being submitted

23   to the Department of Justice for review, as required by the Clean Water Act. (33

24   U.S.C. § 1365, 40 C.F.R. § 135.5).

25       The Clean Water Act provides, in relevant part, that "[n]o consent judgment

26   shall be entered in any action in which the United States is not a party prior to 45

27   days following receipt of a copy of the proposed consent judgment by the Attorney

28   General and the Administrator."

1       Accordingly, because the Department of Justice's review period for the

2   Agreement is forty-five days (*id.*), and to allow the Court's own review of the

3   Agreement, the Parties respectfully make this joint request that the Court take the

4   Case Management Conference scheduled for May 9, 2008, off calendar.

5

6   DATED: April 21, 2008        **COMMUNITIES FOR A BETTER**
7                                       **ENVIRONMENT**

8

9                                         s/Shana Lazerow
                                      Counsel for Plaintiff
10                                        E-mail: slazerow@cbecal.org

11

12  DATED: April 21, 2008        **TRUTANICH • MICHEL, LLP**

13

14                                          s/W.Lee Smith
15                                        Counsel for Defendant
                                      E-mail: lsmith@tmllp.com

16

17

18

19

20

21

22

23

24

25

26

27

28

Consent Agreement

Shana Lazerow, State Bar No. 195491
COMMUNITIES FOR A BETTER ENVIRONMENT
1440 Broadway, Suite 701
Oakland, California  94612
Tel: (510) 302-0430
Fax: (510) 302-0438

Attorneys for Plaintiff
COMMUNITIES FOR A BETTER ENVIRONMENT

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITIES FOR A BETTER ENVIRONMENT, a California non-profit corporation,<br><br>              Plaintiff,<br><br>        vs.<br><br>ACTION METAL RECYCLING, INC., a California corporation,<br><br><br>              Defendant. | CASE NO. C 07-02768 JCS<br><br><br>[Proposed] CONSENT AGREEMENT |

Case No. CV 07-02768 JCS

WHEREAS, Communities for a Better Environment ("CBE") is a California non-profit public benefit corporation with offices in Oakland and Huntington Park, California. CBE works to protect and enhance the environment and public health primarily in California's urban areas. For nearly 30 years, CBE has actively advocated and litigated water quality issues in California;

WHEREAS, Action Metal Recycling, Inc. ("Action Metal") is a California corporation that owns and operates a scrap metal, plastic, and glass recycling facility located at 385 Pittsburg Avenue in Richmond, California ("the Facility");

WHEREAS, storm water discharges in California associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 (State Water Resources Control Board), Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Federal Water Pollution Control Act, 33 U.S.C. §1342 (hereinafter "General Permit");

WHEREAS, on November 10, 2006, CBE served Action Metal, the United States Environmental Protection Agency, the State Water Resources Control Board, the California Regional Water Quality Control Board, the United States Attorney General, and other individuals and entities with a notice of intent to file suit ("60-Day Notice") under sections 505(a)(1) and (f) of the Federal Water Pollution Control Act ("Clean Water Act," "CWA," or "the Act"), 33 U.S.C. § 1365(b)(1)(A), alleging violations of the Act and the General Permit at the Facility;

WHEREAS, on May 25, 2007, CBE filed a complaint alleging violations of the Clean Water Act and the General Permit against Action Metal ("the Complaint") in the United States District Court for the Northern District of California, thereby initiating this action, case number C 07-02768 ("the Lawsuit");

WHEREAS, Action Metal denies the material allegations of the 60-Day Notice and the Lawsuit, denies liability for the causes of action alleged in the Complaint, and denies that it is or has been in violation of the General Permit or the Clean Water Act;

WHEREAS, this Consent Agreement ("Agreement") shall be submitted to the United States Department of Justice for the statutory review period pursuant to 33 U.S.C. § 1365(c);

WHEREAS, CBE and Action Metal (collectively, "the Parties") agree that it is in their mutual interest to resolve the Lawsuit without further litigation by entering into this Agreement and submitting it to the Court for its approval, and by stipulating that the Court retain jurisdiction over the Parties for purposes of enforcement of the Agreement as provided herein;

WHEREAS, the objectives of this Agreement are to ensure that Action Metal endeavors diligently to comply and maintain compliance with the CWA and the General Permit, to ensure that Action Metal uses, implements, and improves ways, means, and methods to reduce the discharge of pollutants into the waters of the United States, and to further the goals and objectives of the CWA and the General Permit; and

WHEREAS, to implement these objectives, the Parties agree to the terms specified in Parts I through V of the Consent Decree, below, which shall be enforceable by each of the Parties and by the Court.

**NOW, THEREFORE, IT IS HEREBY STIPULATED BY AND BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

1.    The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A);

2.    Venue is appropriate in the Northern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(a), because the Facility at which the alleged violations took place is located within this District; and

**I.    ACTION METAL'S OBLIGATIONS**

**A.    Storm Water Pollution Control Measures**

3.    <u>Facility Sweeping.</u>  Prior to the start of the Rainy Season (October 1 – May31), Action Metal will thoroughly sweep and vacuum the facility using a hand sweeper and an industrial vacuum in all uncovered areas of industrial activity and areas impacted by tracking from these areas.  During the Rainy Season, Action Metal will conduct daily sweeping and vacuuming as necessary.  Action Metal will maintain a written record of the areas swept, the time at which the sweeping occurred, and the individual who conducted the sweeping.

Case No. C07-02768 JCS

4.   <u>Covering Drop Inlets.</u>  Action Metal will install covers for all storm drain drop inlets throughout the facility during the Dry Season (April 1-September 30).  During the Rainy Season drop inlets may be uncovered with the approach of storms within twenty-four (24) hours during weekdays, or seventy-two (72) hours over weekends or during shutdown.

5.   <u>Installing Treatment Pond and Treatment System.</u>  Action Metal will construct a treatment and filtration system, including a treatment pond for pre-treatment of water at the Facility that is sufficient to capture a "25-year/24-hour storm event".[1]  Action Metal will send notice of completion to CBE upon completion of installation of the treatment pond and filtration system.

6.   <u>Directing Storm Water to Treatment Pond and Treatment System.</u>  Action Metal will install structural barriers to direct all Facility storm water runoff into the treatment pond and treatment system.

7.   <u>Storm Drain Inspection, Cleaning, and Recordkeeping.</u>  During the Rainy Seasons occurring within the Term of this Agreement, Action Metal shall inspect the storm drains at the Facility prior to forecasted storm events, and shall clean, repair, or replace any treatment system, as necessary.  Action Metal shall maintain a log of all inspections, maintenance, and cleaning of storm drains at the Facility.  The log shall identify the person who conducted the inspections, the date of inspection, and any actions taken as a result of the inspection.

8.   <u>Maintenance of Structural Controls.</u>  Action Metal shall maintain all structural Best Management Practices ("BMPs") at the Facility in good operating condition, including berms and filtration systems.

9.   <u>Employee Training.</u>  Within thirty (30) days after the Effective Date of this Agreement, annually thereafter, and within thirty (30) days of hiring new employees, Action Metal shall explain to all appropriate employees the requirements of this Agreement, the Facility

---

[1] The term "25-year/24-hour storm event" means a storm event that occurs statistically every twenty-five (25) years. It is the amount of rain that has a one hundred percent likelihood of falling within a 24-hour period within any twenty-five (25) consecutive years in a given area.  Thus, it has a four percent (4%) probability of occurring in a single year in that same area.  See National Oceanic and Atmospheric Administration (NOAA) Atlas 2, "Precipitation Frequency Atlas of the Western United States" (1973), 5, 10, 25, 50, and 100 Year – 24 Hour Precipitation for Northern California.

Case No. C07-02768 JCS

1   Storm Water Pollution Prevention Plan ("SWPPP"), and the General Permit to the extent

2   applicable to any such employee.  Training shall focus on the employee's role in implementing

3   BMPs, sweeping, conducting Facility inspections, and collecting storm water samples.  Training

4   shall be conducted bilingually (i.e., in English and Spanish, or other pertinent language) if

5   appropriate to assist the employee in understanding the training.  Action Metal shall integrate any

6   new training requirements resulting from this Agreement into the Facility's SWPPP.

7   **B.   Storm Water Pollution Prevention Plan**

8   10.  <u>Management Measures.</u>  Within 45 days of the Effective Date of this Agreement,

9   Action Metal shall revise its SWPPP to incorporate the requirements of this Agreement.  Action

10  Metal shall revise its SWPPP annually as necessary to incorporate additional BMPs it develops.

11  11.  <u>Site Map.</u>  Prior to the Effective Date of this Agreement, Action Metal will update its

12  Facility Site Map to identify:

13  - the drainage of storm water throughout the Facility;

14  - any run-on to the Facility of storm water from neighboring properties;

15  - all points from which storm water is discharged from the Facility;

16  - the location at which Action Metal takes storm water samples; and

17  - all portions of the Facility where industrial processes occur, including but not

18     limited to all outdoor sorting and storage areas.

19  12.  <u>Review of SWPPP and Facility Site Map.</u>  Prior to the Effective Date of this

20  Agreement, Action Metal will provide copies of its amended SWPPP and Facility Site Map to

21  CBE.  CBE will have thirty (30) days from receipt of the amended SWPPP and Facility Site Map

22  to propose changes.  If CBE provides proposed changes pursuant to this paragraph, Action Metal

23  will give good faith consideration to such proposed changes, but Action Metal is in no way bound

24  to incorporate CBE's proposed changes into Action Metal's SWPPP.

25  **C.   Storm Water Sampling and Analysis.**

26  13.  <u>Sampling Frequency.</u>  Action Metal shall collect:

27  a)   two (2) storm water samples during the 2007-2008 Rainy

28        Season (the "Installation Year"), in addition to as many

-5-

1   samples as necessary to calibrate and verify the functionality

2   of Action Metal's filtration system;

3   b)   five (5) storm water samples from Qualifying Storm Events

4   during the 2008-2009 Rainy Season (the "Monitoring

5   Year"); and

6   c)   five (5) storm water samples during the 2009-2010 rainy

7   Season (the "Reporting Year").

8   A "Qualifying Storm Event" is one that (a) occurs during Action Metal's regular business hours

9   (i.e., 8:00 a.m. to 3:50 p.m. Monday through Friday, 8:00 a.m. to 11:30 a.m. Saturday) and (b) is

10   preceded by at least three (3) days without storm water discharges.  Action Metal shall collect

11   storm water samples within the first hour a Qualifying Storm Event is observed.

12   14.   Storm Water Analysis.  Action Metal will send each storm water sample collected

13   pursuant to this Agreement to a California state certified environmental laboratory for analysis.

14   For each year, two (2) samples shall be analyzed for all of the parameters listed in Exhibit A.  In

15   the Monitoring Year and the Reporting Year, the remaining three (3) samples to be taken that year

16   will be analyzed for metals (Al, Cd, Cu, Cr, Fe, Mn, Ni, Pb, Zn) and TSS.  Within fifteen (15)

17   days of receiving the complete laboratory analysis of a storm water sample taken pursuant to the

18   Agreement, Action Metal shall send the complete analysis to CBE.  The analysis shall be

19   accompanied by a letter from Action Metal identifying any parameter in excess of the Action

20   Levels identified in Exhibit A, with an explanation, if known, of the source or cause of the

21   exceedance and a description of the actions, if any, that Action Metal is then considering in

22   response to the exceedance.  If three consecutive samples collected during one Wet Season have

23   concentrations of a particular parameter below the Action Level for that parameter set forth in

24   Exhibit A, then Action Metal does not have to analyze the other samples collected for that

25   particular parameter, unless otherwise required by the General Permit.

26   15.   Action Plan for Exceedance of Action Levels.  If the storm water samples taken

27   pursuant to paragraph 13 show a concentration of any parameter in excess of the Action Levels

28   specified in Exhibit A, then on or before July 15th following the Rainy Season in which the sample

-6-

1   was taken, Action Metal shall prepare and send to CBE an Action Plan designed to make

2   reasonable progress towards achieving the Action Levels.  The Action Plan shall set forth the

3   sample results showing the exceedance, the possible cause and/or the source of the exceedance, if

4   known, the action that Action Metal is proposing or has taken in response to the exceedance, and a

5   reasonable timeframe for implementation.

6           In developing the Action Plan, Action Metal shall consider the following:

7                   a.      The installation of additional berms or equivalent structural controls;

8                   b.      Calculating the total storm water discharge from the Facility as estimated

9   from rainfall and using appropriate run-off coefficients, or by installing flow meters, to

10  determine whether additional on-site use of storm water in Action Metal's processes is feasible;

11                  c.      Implementing additional BMPs to reduce or prevent the discharge of storm

12  water from the Facility of industrial pollutants onto public streets, which may include storing

13  materials or equipment in a manner that reduces or prevents the discharge of pollutants from the

14  Facility resulting from material spillage or tracking onto the parking lots or driveways

15  surrounding the Facility;

16                  d.      Paving unpaved areas of the Facility where significant vehicle traffic

17  occurs or from which storm water discharges from the Facility; where not already implemented,

18  installing an appropriate storm drain inlet/catch basin and storm water filter system designed to

19  collect and treat (by means of such filter) storm water runoff from the corresponding paved area;

20                  e.      Installing further treatment systems for the treatment of storm water prior

21  to discharge;

22                  f.      Installing a piping system to convey storm water to the local publicly

23  owned treatment works sanitary sewage collection system and discharging some or all storm

24  water that currently discharges from the Facility to this collection system; and

25                  g.      Identifying and segregating pollutant-generating materials away from areas

26  that discharge storm water from the Facility.

27          If CBE believes that Action Metal's proposed Action Plan will not make reasonable

28  progress toward achieving the Action Levels or otherwise reduce the amount of storm water

-7-

1   discharged from the Facility, CBE shall have thirty (30) days after receipt of the Action Plan to

2   comment on and propose revisions.  If CBE proposes revisions pursuant to this subsection,

3   Action Metal will give good faith consideration to such proposed revisions, but Action Metal is in

4   no way bound to incorporate CBE's proposed revisions into Action Metal's proposed Action

5   Plan.

6        16.  Liquidated Payments for Exceedances of Benchmark Levels.  Action Metal shall make

7   a liquidated payment for any storm water sample that contains a concentration of any parameter in

8   excess of the Benchmark levels specified in Exhibit A.  The amount of the liquidated payments

9   shall be as follows:

10       • 1st sampling containing an exceedance: $500.00

11       • 2nd sampling containing an exceedance: $1,000.00

12       • 3rd sampling containing an exceedance: $1,000.00

13       • 4th sampling containing an exceedance: $2,000.00

14       • 5th sampling containing an exceedance: $2,500.00

15   Payments described directly above shall only apply during the Monitoring Year, and shall not

16   apply to exceedances of the Benchmark for conductivity.  Action shall only be liable for, at most,

17   one liquidated payment for any given rain event during which sampling is performed, even if

18   samples taken during that rain event contain multiple exceedances of the Benchmark levels

19   specified in Exhibit A.  Action Metal will make all payments required under this paragraph by

20   July 15, 2009.  These payments will be made to the Rose Foundation for Communities and the

21   Environment, to be used for projects that will benefit the environment of the San Francisco Bay-

22   Delta watershed.  Payments to the Rose Foundation will be sent via overnight mail to:  6008

23   College Avenue, Oakland, CA  94618, Attn: Tim Little.  Notice of these payments shall be sent to

24   CBE at the time the payments are made.

25        17.  Copies of Documents. During the Term of this Agreement, Action Metal shall provide

26   CBE with copies of all documents it submits to the San Francisco Bay Regional Water Quality

27   Control Board and/or the State Water Resources Control Board regarding the Facility's

28   compliance with the General Permit, within seven (7) days of such submittal as well as any

-8-

revisions to the Facility's SWPPP, within seven (7) days of such revisions being adopted by Action Metal.

18. <u>Site Inspections.</u> CBE may perform one physical inspection of the Facility during each year of the Term of this Agreement upon written request and with at least forty-eight (48) hours' notice. Inspections may include the taking of photographs, video/film and field notes. CBE representatives must be accompanied on their inspections by one or more representatives of Action Metal. Any Action Metal representative who accompanies CBE representatives on an inspection of the Facility shall have discretion to deny CBE's representatives access to any portion of the Facility deemed unsafe for visitors. CBE shall provide Action Metal with a copy of all photographs, notes, and videos resulting from CBE's inspections.

## II.     PAYMENTS, FEES, AND COSTS

19. <u>Environmental Mitigation Fund.</u> Within six (6) months of completing installation and calibration of the treatment and filtration system, in addition to any liquidated payment required by paragraph 16 above, Action Metal will pay $10,000 in to The Rose Foundation for projects that will benefit the environment of San Francisco Bay-Delta watershed. Action Metal will send this payment via overnight mail to: 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little. Notice of this payment shall be sent to CBE at the time the payment is made. Based on confidential information provided by Action Metal and the factors to be considered under the Clean Water Act, the size of this payment is appropriate. CBE expressly agrees to keep confidential any confidential information provided by Action Metal. Accordingly, CBE is not to disclose such confidential information to any party for any reason without either the express written consent of Action Metal or a court order.

20. <u>Reimbursement of Fees and Costs.</u> Within thirty (30) days of the Effective Date of this Agreement, Action Metal shall pay CBE $15,000 to defray the reasonable costs incurred in investigating the activities at the Facility related to this Agreement, bringing these matters to Action Metal's attention, and negotiating a resolution of this Lawsuit in the public interest. Such reasonable costs include those resulting from investigation, filing fees and costs, expert fees and costs, and attorney's fees and costs.

Case No. C07-02768 JCS

III.     **DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

21. <u>Meet and Confer.</u>  If a dispute under this Agreement arises or either Party believes that a breach of this Agreement has occurred, the Parties shall meet and confer within seven (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to attempt to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute or cure the breach.

22. <u>Rights upon Failure of or to Meet and Confer.</u>  If the Parties fail to meet and confer or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, then the Parties shall be entitled to all rights and remedies under the law, including the right to file a motion with the District Court of the Northern District of California, which shall retain jurisdiction over this action for the limited purposes of enforcement of the terms of this Agreement.  Similarly, if the Parties agree to participate in mediation as a result of a meet and confer, seven (7) days must pass after the conclusion of that mediation before either party may act to have the alleged breach redressed.   A party who prevails on a motion to enforce the terms of the agreement shall be entitled to fees and costs pursuant to the provisions set forth in section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting such provisions.

IV.     **WAIVER AND RELEASES**

23. <u>CBE.</u>  As of the Effective Date of this Agreement, CBE, on its own behalf and on behalf of its members, officers, directors, attorneys, agents, servants, stockholders, employees, representatives, affiliates, subsidiary and parent corporations, partners, assigns, successors, and any other person or entity representing or purporting to represent CBE, hereby fully releases and discharges Action Metal and its officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of their predecessors, successors and assigns, and each of their agents, attorneys, consultants and other representatives (each a "Released Party") from any and all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed, or which could have been claimed, for matters associated with or related to the 60-day Notice, the Clean

-10-

1   Water Act, the General Permit, or California's Health & Safety Code section 25249.5 *et seq.*, as

2   those laws may relate to storm water discharges from the Facility, (each and all a "Storm Water

3   Law"), whether known or unknown, including, without limitation, all such matters concerning or

4   relating to the alleged failure of Action Metal to comply with any Storm Water Law at the Facility

5   up to the Termination Date of this Agreement.

6       24.   <u>Action Metal.</u>   As of the Effective Date of this Agreement, Action Metal, on its own

7   behalf and on behalf of its officers, directors, agents, servants, stockholders, employees,

8   representatives, affiliates, subsidiary and parent corporations, partners, assigns, and successors,

9   hereby fully releases and forever discharges CBE and its members, officers, directors, attorneys,

10  agents, servants, stockholders, employees, representatives, affiliates, subsidiary and parent

11  corporations, partners, assigns and successors from any and all rights, claims and actions related

12  to or arising out of the matters and alleged violations of Storm Water Law asserted in the Lawsuit.

13      25.   <u>Waiver of All Claims Regarding Storm Water Discharge.</u>   It is the intention of the

14  Parties, in executing this Agreement and receiving the consideration recited herein, that this

15  Agreement is effective as a full and final accord and satisfaction and mutual release of all claims,

16  debts, damages, liabilities, demands, obligations, costs, expenses, disputes, actions or causes of

17  action, known or unknown, suspected or unsuspected, that each Party may have against the other

18  arising from storm water discharges, and activities ancillary thereto, occurring before the date of

19  this Agreement.   In furtherance of this intention, the Parties hereby acknowledge that they are

20  familiar with California Civil Code section 1542 and that they hereby expressly waive the

21  protection of that section, which provides as follows:

22

23  **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
    CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
    FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF**

24  **KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS**

25  **OR HER SETTLEMENT WITH THE DEBTOR.**

26

27  The Parties each waive and relinquish any right or benefit that they have or may have under

28  California Civil Code section 1542 regarding storm water discharges.   That is, no party hereto

-11-

1  may invoke the benefits of California Civil Code section 1542, or any such similar law, in order to

2  prosecute any claims released hereunder related to any storm water discharge occurring prior to

3  the execution of this Agreement.  In connection with such waiver and agreement, each party

4  hereto acknowledges that they are aware that they or their attorney may hereafter discover claims

5  or facts or legal theories in addition to or different from those which they know or believe to exist

6  with respect to the action, but that it is their intention hereby to fully, finally, and forever settle

7  and release all of the claims, known or unknown, suspected or unsuspected, which do now exist,

8  may exist, or heretofore have existed between the Parties by reason of any acts, circumstances,

9  facts, events, or transactions related to storm water discharges occurring before the date of this

10  Agreement.  In furtherance of such intention, with regard to storm water discharges, the release

11  herein given shall be and remain in effect as a full and complete release.  It is expressly

12  acknowledged and understood by the Parties to this Agreement that they separately bargained for

13  the foregoing waiver of the provisions of section 1542 of the California Civil Code.  The Parties

14  hereby declare that they had independent legal advice from their attorneys with respect to

15  foregoing waiver, with respect to the advisability of executing this Agreement, and with respect to

16  the meaning of Civil Code section 1542.  The Parties to this Agreement consent that this release

17  shall be given full force and effect in accordance with each and all of the express terms and

18  provisions herein, including those terms and provisions related to such unknown and unsuspected

19  claims, demands, and causes of action.

20      26.  Stipulation and Order for Dismissal.  Upon execution by all Parties, the Plaintiffs shall

21  lodge this Agreement with the Court, along with a letter explaining the 45-day Department of

22  Justice review period required by the Clean Water Act.  Plaintiffs shall also forward a copy of the

23  Agreement to the Department of Justice for its review under the Clean Water Act, 33 U.S.C.

24  Section 1365(c).  At the time this Agreement is submitted to the Court for approval, the Parties

25  shall file with the Court a Stipulation and Order that shall provide:

26      a.  the Complaint and all claims therein shall be dismissed with prejudice

27  pursuant to Fed. R. Civ. P. 41(a)(2); and

28

-12-

b.    the Court shall retain and have jurisdiction over the Parties for the purposes of enforcing the terms of this Agreement.

27.  <u>No Admission of Liability</u>.  The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Agreement shall be construed as, and Action Metal expressly does not intend to imply, an admission as to any fact, finding, issue or law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Action Metal of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

## V.    MISCELLANEOUS PROVISIONS

28.  <u>Effective Date</u>.  The "Effective Date" of this Agreement is the last date of a signature of a party on this Agreement.

29.  The "Term" of this Agreement is the time between and including the Effective Date and the Termination Date, that is, three (3) years.

30.  <u>Termination</u>.  This Agreement – and the Parties' respective rights to enforce any obligations hereunder – shall terminate on the "Termination Date," defined for purposes of this Agreement as three (3) years after the Effective Date.

31.  <u>Force Majeure</u>.  No Party shall be considered to be in default in the performance of any of its obligations under this Agreement when performance becomes impossible, despite the timely good-faith efforts of the party, due to circumstances beyond the Parties' control, including, without limitation, any act of God, war, fire, earthquake, flood, and restraint by court order or public authority.  Circumstances beyond the parties' control shall not include normal inclement weather, economic hardship, or inability to pay.  Any party seeking to rely upon this paragraph shall have the burden of establishing that it could not reasonably have been expected to avoid, and which by exercise of due diligence has been able to overcome, the impossibility of performance.

32.  <u>Integrated Agreement</u>.  This Agreement contains the sole and entire agreement and understanding of the Parties with respect to the entire subject matter hereof, and any and all prior discussions, negotiations, commitments and understandings related hereto. No other agreements,

-13-

1    covenants, representations, or warranties not specifically referred to herein, express or implied,

2    oral or written, shall be deemed to exist or to bind any of the Parties.

3        33.  Information Collected.  Any data, photographs, video, financial information, or any

4    other records or information collected or divulged pursuant to this Agreement, or any combination

5    thereof, shall not be used or provided by either of the Parties in any manner in any future litigation

6    against either of the Parties, including litigation by any owner or employee thereof.

7        34.  Modification.  This Agreement may only be modified by the written agreement of both

8    Parties hereto. Any such modification shall only become effective upon approval by the Court.

9        35.  Severability.  The Parties agree that if any provision of this Agreement shall under any

10   circumstances be deemed invalid or inoperative, this Agreement shall be construed with the

11   invalid or inoperative provision deleted, and the rights and obligations of the Parties shall be

12   construed and enforced accordingly.

13       36.  Successors.  This Agreement shall apply to, be binding upon, and inure to the benefit

14   of, the Parties and their successors and assigns.

15       37.  Notices.  Any notice to CBE required or permitted by this Agreement shall be sent via

16   electronic mail to the following e-mail addresses (unless impracticable): slazerow@cbecal.org and

17   abloch@cbecal.org.  To the extent electronic transmission is impracticable, a hard copy shall be

18   mailed to CBE at the addresses below:

19

20   Shana Lazerow
     Communities for a Better Environment
21   14400 Broadway, Suite 701
     Oakland, California  94612

22

23   Any notice to Action Metal required or provided for by this Agreement shall be sent by U.S. Mail

24   and email to the following individuals at the following addresses:

25

26   W. Lee Smith
     180 East Ocean Boulevard, Suite No. 200
27   Long Beach, CA 90802
     lsmith@tmllp.com

28

-14-

Case No. C07-02768 JCS

With copies to:

Marvin Mendelsohn
385 Pittsburgh Ave.
Richmond, CA 94801

38. <u>Payments.</u> Unless otherwise stated herein, any payment required by this Agreement to be made to CBE will be made out to Communities for a Better Environment and hand-delivered or sent via overnight mail to 1440 Broadway, Suite 701, Oakland, CA 94612.

39. <u>Execution in Counterparts.</u> This Agreement may be executed in one or more counterparts, which taken together, shall be deemed to constitute one and the same document.

40. <u>Facsimile Signatures.</u> Signatures of the Parties to this Agreement transmitted by facsimile shall be deemed binding.

41. <u>Continuing Jurisdiction of Court.</u> The "Court" specified in this Agreement is the United States District Court for the Northern District of California. The Court shall retain jurisdiction to enforce all provisions of this Agreement during its Term.

42. <u>Court Approval.</u> The Parties enter into this Agreement and intend to submit it to the Court for its approval and entry as a final judgment, pursuant to the terms of the stipulation and order. If for any reason the Court should decline to approve this Agreement in the form presented, the Parties agree to negotiate in good faith to modify the Agreement to address the Court's concerns. If the Court determines it cannot approve the Agreement even after the Parties have attempted to modify the Agreement to address the Court's concerns, this Agreement shall be void and have no binding effect on either of the Parties.


COMMUNITIES FOR A BETTER ENVIRONMENT

Date: ___2/26___, 2008

By: _____
    Bill Gallegos, Executive Director

Case No. C07-02768 JCS                    -15-

1    Communities for a Better Environment

2

3    ACTION METAL, INC.

4    Date: ___3/25/08___, 2008

5    By: _____

6    , President

7

8    APPROVED AND SO ORDERED, this 11th day of __June_____, 2008

9    _____

10   Honorable J____ C. Spero

     Ma_____

11   Uni_____ ___ ___ Court

     No_____ California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-16-

# EXHIBIT A

| Constituent | Action Level | Benchmark |
|---|---|---|
| **Aluminum** | 0.087 mg/l | 0.750 mg/l |
| **Cadmium** | 0.0093 mg/l | 0.0159 mg/l |
| **Copper** | 0.0031 mg/l | 0.0636 mg/l |
| **Chromium (total)** | 0.011 mg/l | NA |
| **Iron** | 1.0 mg/l | 1.0 mg/l |
| **Manganese** | 0.5 mg/l | 1.0 mg/l |
| **Nickel** | 0.0082 mg/l | 1.417 mg/l |
| **Lead** | 0.0032 mg/l | 0.0816 mg/l |
| **Zinc** | 0.081 mg/l | 0.117 mg/l |
| **Total Suspended Solids** | 25 mg/l | 100 mg/l |
| **pH** | 6.5 to 8.5 | 6.0-9.0 |
| **Oil & Grease** | 10 mg/l | 15 mg/l |

Case No. C07-02768 JCS